UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | |
|---|---|
| TREPPEL FAMILY TRUST U/A 08/18/18 LAWRENCE A. TREPPEL AND GERI D. TREPPEL FOR THE BENEFIT OF GERI D. TREPPEL AND LARRY A. TREPPEL, Derivatively on Behalf of FIRSTCASH HOLDINGS, INC., | Case No. |
| | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY |
|                     Plaintiff,<br>    v. | |
| RICK L. WESSEL,  R. DOUGLAS ORR, DANIEL R. FEEHAN, MIKEL D. FAULKNER, RANDEL G. OWEN, DANIEL E. BERCE, JAMES H. GRAVES, and JORGE MONTAÑO, | |
|                     Defendants,<br>   -and- | |
| FIRSTCASH HOLDINGS, INC., a Delaware Corporation, | |
|                     Nominal Defendant. | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents provided to plaintiff for inspection in response to its inspection demand pursuant to 8 *Del. C* §220 (the "Section 220 Documents"), a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant FirstCash Holdings, Inc. ("FirstCash" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in significant damages to FirstCash's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed FirstCash to millions of dollars in potential liability for violations of state and federal law.

2.      This action concerns the defendants' responsibility for the Company's thousands of violations of the Military Lending Act (the "MLA") over at least a five-year period.  The MLA prohibits pawnbrokers from charging service members and their dependents more than a 36% annual percentage rate on loans and from including forced arbitration clauses.  Compliance with the MLA is monitored by the Consumer Financial Protection Bureau (the "CFPB").

3.      Despite the MLA's unambiguous restrictions, CFPB Director Rohit Chopra, revealed that FirstCash (and its subsidiary Cash America West, Inc.) is a "repeat offender and

cheated military families over and over again."  Director Chopra continued that "FirstCash and Cash America West gouged military families and robbed them of their rights to go to court."

4.    The CFPB reviewed data covering only 10% of the Company's operations and only during a limited time period, yet still found over 3,600 loans that violated the MLA.  The CFPB has explained that it believes that FirstCash engaged in substantially more violations that its limited data does not yet reflect.

5.    Compliance with the MLA is not complicated.  The U.S. Department of Defense contains a database of individuals covered by the MLA.  The MLA provides a safe harbor for companies that check an individual against this database before lending.  FirstCash, however, chose not to go this route.  The CFPB has now brought an action seeking an injunction to prevent further violations, redress for affected consumers, and a civil monetary penalty.

6.    In addition, for years, the defendants told the market that FirstCash had cutting-edge compliance technology, provided significant training to ensure legal and regulatory compliance, did not make loans to people covered by the MLA, and the pawn loan industry, in general, and FirstCash, specifically, faced little federal government oversight.  Notably, the defendants repeated substantially similar statements despite receiving two Civil Investigative Demands ("CIDs") from the CFPB and never disclosed the receipt of these CIDs.

7.    Thus, the investing public was shocked when the CFPB brought its lawsuit detailing the Company's violations.  In the wake of the CFPB's announcement describing its lawsuit, FirstCash's stock plunged more than 18% over the next three days, erasing more than $636 million in market capitalization.

8.     Further, as a direct result of this unlawful course of conduct, FirstCash is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of Texas on behalf of investors who purchased FirstCash's shares.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) FirstCash maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to FirstCash, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Treppel Family Trust U/A 08/18/18 Lawrence A. Treppel and Geri D. Treppel For the Benefit of Geri D. Treppel and Larry A. Treppel was a stockholder of FirstCash

at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current FirstCash stockholder. Plaintiff is a citizen of California.

**Nominal Defendant**

13.    Nominal defendant FirstCash is a Delaware corporation with principal executive offices located at 1600 West 7th Street, Fort Worth, Texas. Accordingly, FirstCash is a citizen of Delaware and Texas. FirstCash, together with its subsidiaries, operates pawn stores in the United States and Latin America and also provides retail point-of-sale payment solutions focused on serving credit-constrained consumers. In connection with the acquisition of American First Finance, Inc., effective December 16, 2021, the Company completed a holding company reorganization creating a new holding company, FirstCash Holdings, Inc., which succeeded FirstCash, Inc. FirstCash, Inc. now operates as a subsidiary of the Company. As of December 31, 2021, the Company had approximately 17,000 employees across five countries, including approximately 6,400 employees in the United States.

**Defendants**

14.    Defendant Rick L. Wessel ("Wessel") has been FirstCash's Vice-Chairman of the Board of Directors (the "Board") since September 2016, Chief Executive Officer since November 2006, and a director since November 1992. Defendant Wessel was also FirstCash's President from May 1998 to September 2016, Chairman of the Board from October 2010 to September 2016, Vice-Chairman of the Board from November 2004 to October 2010, Secretary and Treasurer from May 1992 to November 2006, and Chief Financial Officer from May 1992 to December 2002. Defendant Wessel is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. FirstCash paid defendant Wessel the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2021 | $1,210,250 | - | $3,453,904 | $2,428,064 | $83,249 | $7,175,467 |
| 2020 | $1,210,250 | $1,715,529 | $7,478,258 | - | $84,566 | $10,488,603 |
| 2019 | $1,175,000 | - | $3,647,252 | $2,443,256 | $164,213 | $7,429,721 |
| 2018 | $1,175,000 | - | $2,926,000 | $3,525,000 | $178,440 | $7,804,440 |
| 2017 | $1,075,000 | - | $2,144,423 | $2,825,945 | $126,631 | $6,171,999 |

Defendant Wessel is a citizen of Texas.

15.    Defendant R. Douglas Orr ("Orr") has been FirstCash's Chief Financial Officer since January 2003 and Executive Vice President since January 2005. Defendant Orr was also FirstCash's Vice President of Finance from July 2002 to January 2003. Defendant Orr is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934. FirstCash paid defendant Orr the following compensation as a director:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|-------|
| 2021 | $695,250 | - | $1,195,664 | $958,141 | $2,849,055 |
| 2020 | $695,250 | $821,264 | $2,492,777 | - | $4,009,291 |
| 2019 | $675,000 | - | $1,326,266 | $1,047,386 | $3,048,652 |
| 2018 | $675,000 | - | $1,024,100 | $1,350,000 | $3,049,100 |
| 2017 | $650,000 | - | $965,000 | $1,179,356 | $2,794,356 |

Defendant Orr is a citizen of Texas.

16.    Defendant Daniel R. Feehan ("Feehan") has been FirstCash's Chairman of the Board and a director since September 2016, and also a non-executive employee of the Company since September 2016. FirstCash paid defendant Feehan the following compensation as a director:

| Year | All Other Compensation | Total |
|------|------------------------|-------|
| 2021 | $300,000 | $300,000 |
| 2020 | $300,000 | $300,000 |
| 2019 | $250,000 | $250,000 |
| 2018 | $250,000 | $250,000 |
| 2017 | $250,000 | $250,000 |

Defendant Feehan is a citizen of Texas.

17.    Defendant Mikel D. Faulkner ("Faulkner") has been FirstCash's Lead Independent Director since October 2017 and a director since October 2009. Defendant Faulkner was a member of FirstCash's Audit Committee from April 2019 to December 2019. Defendant Faulkner has been a member of FirstCash's Nominating and Corporate Governance Committee since at least April 2017 and was Chair of that committee from at least April 2017 to at least December 2019. FirstCash paid defendant Faulkner the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2021 | $125,000 | $92,445 | $217,445 |
| 2020 | $125,000 | $114,061 | $239,061 |
| 2019 | $110,000 | $110,486 | $220,486 |
| 2018 | $100,000 | $90,560 | $190,560 |
| 2017 | $100,000 | $90,000 | $190,000 |

Defendant Faulkner is a citizen of Texas.

18.    Defendant Randel G. Owen ("Owen") has been a FirstCash director since October 2009. Defendant Owen has been a member of FirstCash's Audit Committee since at least April 2017. Defendant Owen has been the Chair of FirstCash's Nominating and Governance Committee since July 2020 and a member of that committee since at least December 2019. FirstCash paid defendant Owen the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2021 | $115,000 | $92,445 | $207,445 |
| 2020 | $117,500 | $114,061 | $231,561 |
| 2019 | $115,000 | $110,486 | $225,486 |
| 2018 | $105,000 | $90,560 | $195,560 |
| 2017 | $105,000 | $90,000 | $195,000 |

Defendant Owen is a citizen of Colorado.

19.     Defendant Daniel E. Berce ("Berce") has been a FirstCash director since September 2016.  Defendant Berce has been the Chair of FirstCash's Audit Committee since at least April 2017.   Defendant Berce was also a member of the Nominating and Corporate Governance Committee from at least April 2017 to at least December 2019.  FirstCash paid defendant Berce the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2021 | $125,000 | $92,445 | $217,445 |
| 2020 | $125,000 | $114,061 | $239,061 |
| 2019 | $120,000 | $110,486 | $230,486 |
| 2018 | $110,000 | $90,560 | $200,560 |
| 2017 | $110,000 | $90,000 | $200,000 |

Defendant Berce is a citizen of Texas.

20.     Defendant James H. Graves ("Graves") has been a FirstCash director since September 2016.  Defendant Graves was a member of FirstCash's Audit Committee from at least April 2017 to December 2020.  Defendant Graves has been a member of FirstCash's Nominating and Corporate Governance Committee since at least December 2019 and was Chair of that committee from January 2020 to July 2020.  FirstCash paid defendant Graves the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2021 | $120,000 | $92,445 | $212,445 |
| 2020 | $117,500 | $114,061 | $231,561 |
| 2019 | $100,000 | $110,486 | $210,486 |
| 2018 | $90,000 | $90,560 | $180,560 |
| 2017 | $90,000 | $90,000 | $180,000 |

Defendant Graves is a citizen of Tennessee.

21.     Defendant Jorge Montaño ("Montaño") was a FirstCash director from June 2016 to June 2019, and also from June 2010 to July 2013.  Defendant Montaño was a member of FirstCash's Nominating and Corporate Governance Committee from at least April 2017 to April 2019.  FirstCash paid defendant Montaño the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2019 | $45,000 | - | $45,000 |
| 2018 | $90,000 | $90,560 | $180,560 |
| 2017 | $90,000 | $90,000 | $180,000 |

Defendant Montaño is a citizen of Mexico.

22.     The defendants identified in ¶¶14-15 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14, 16-21 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶17-20 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶17-21 are referred to herein as the "Nominating and Corporate Governance Committee Defendants."  Collectively, the defendants identified in ¶¶14-21 are referred to herein as the "Individual Defendants."

<u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

**Fiduciary Duties**

23.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe FirstCash and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage FirstCash in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of FirstCash and not in furtherance of their personal interest or benefit.

24.     To discharge their duties, the officers and directors of FirstCash were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of FirstCash were required to, among other things:

(a)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how FirstCash conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

25.     The Company's Code of Business Conduct and Ethics states that "[c]overed [p]ersons," which includes directors and officers, must comply with the following behaviors:

**Honest and Ethical Conduct**

In performing his or her duties, each of the Covered Persons will act in accordance with high standards of honest and ethical conduct, including taking appropriate actions to permit and facilitate the ethical handling and resolution of actual or apparent conflicts of interest between personal and professional relationships, as discussed below.

While all Covered Persons are required to adhere to the Code, the ethical and professional conduct of the Company's chief executive officer and senior financial officers is essential to the proper function and success of the Company. The Company's chief executive officer and senior financial officers have a particular responsibility to act with honesty and integrity and within the parameters of this Code and the Company's other policies and to take all reasonable measures to achieve responsible use of and control over the Company's assets, resources and information.

\*     \*     \*

- 9 -

**Compliance with Laws, Rules and Regulations**

In performing his or her duties, each of the Covered Persons will endeavor to comply, and take appropriate action within his or her areas of responsibility to cause the Company to comply, with applicable governmental laws, rules, and regulations and applicable rules and regulations of self- regulatory organizations.

*       *       *

**Reporting Illegal or Unethical Behavior**

Each of the Covered Persons will promptly provide the Company's chief executive officer, chief operating officer or chief financial officer or the Company's Audit Committee with information concerning conduct the Covered Person reasonably believes to constitute a material violation by the Company or any Covered Person of this Code, securities laws, rules or regulations or other laws, rules, or regulations applicable to the Company. Covered Persons are encouraged to talk to supervisors, managers, or other appropriate personnel when in doubt about the best course of action in a particular situation. If the Covered Person's direct supervisor is involved in the possible violation, the Covered Person should speak with the next individual in seniority to the Covered Person's direct supervisor.

A Covered Person who in good faith reports suspected or alleged violations of the Code shall not be subjected to retaliatory conduct for his or her submission. However, it is a violation of this Code for a Covered Person to submit an alleged violation if the Covered Person knows the allegation to be false.

The Company requires that every reported violation be investigated. Disciplinary action for violations of the Code will be taken promptly, consistently and decisively in accordance with the Company's disciplinary policy and may include termination of employment.

26.     The Company's Corporate Governance Guidelines explain the following for the

role of the Board:

**Role and Composition of the Board**

**1. Role of the Board.** The business and affairs of the Company shall be managed by or under the direction of the Board. It is the ultimate decision-making body of the Company except with respect to those matters reserved to the stockholders. The basic responsibilities of the members of the Board (the "Directors") are to exercise their business judgment and act in what they reasonably believe to be in the best interests of the Company and its stockholders. Each Director will, in the performance of such Director's duties, be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or

statements presented to the Company by any of the Company's officers or employees, or committees of the Board, or by another person as to matters such director reasonably believes are within such others person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.

The Board elects the officers of the Company, who are charged with the conduct of the Company's business. Having elected the officers, the Board acts as an advisor and counselor to the officers and ultimately monitors its performance, the effectiveness of its policies and decisions, and the execution of its strategies. The Board may delegate the oversight and management of certain areas of risk to the Company to its committees, but the entire Board shall generally oversee such risks and be regularly informed through committee reports and management presentations about such risks.

**Additional Duties of the Audit Committee Defendants**

27.    In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Berce, Graves, Faulkner, and Owen, owed specific duties to FirstCash to assist the Board in overseeing "the accounting and financial reporting process of the Company," as well as "the Company's compliance with legal and regulatory requirements."   Moreover, the Audit Committee's Charter provides that the Audit Committee is required to:

(i)  to prepare any report or other disclosures, including any recommendation of the Committee, required by the rules of the SEC to be included in the Company's annual proxy statement;

(ii)  to periodically review and discuss with management the Company's guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management, including discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures;

*        *        *

(iv) to report its activities to the full Board on a regular basis and to make such recommendations with respect to the above and other matters as the Committee may deem necessary or appropriate, including review with the board any issues that arise with respect to:

- the quality or integrity of the Company's financial statements;

- the performance and independence of the Company's independent auditor;

- the performance of the Company's internal audit function; and

- the Company's compliance with legal and regulatory requirements;

(v) to undertake and review with the Board an annual performance evaluation of the Committee, which shall compare the performance of the Committee with the requirements of this Charter and set forth the goals and objectives of the Committee for the upcoming year. The performance evaluation by the Committee shall be conducted in such manner as the Committee deems appropriate. The report to the Board may take the form of an oral report by the chairperson of the Committee or any other member of the Committee designated by the Committee to make this report; and

(vi) to advise the Board with respect to the Company's policies and procedures regarding the compliance with the applicable laws and regulations and with the Company's Code of Business Conduct and Ethics.

**Additional Duties of the Nominating and Corporate Governance Committee Defendants**

28.    In addition to these duties, under its Charter, the Nominating and Corporate Governance Committee Defendants, defendants Berce, Faulkner, Graves, Montaño, and Owen, owed specific duties to FirstCash to:

Oversee the system of corporate governance of the Corporation, including: (i) developing and recommending to the Board a set of corporate governance structures and procedures for the Company; (ii) reviewing and reassessing the adequacy of the structures and procedures at least annually; and (iii) recommending improvements to such governance structures and procedures for adoption by the Board and incorporation into the Company's written guidelines, as the Committee believes are appropriate.

**FIRSTCASH IS SUBJECT TO THE 2013 CONSENT ORDER<br>DUE TO THE MERGER WITH CASH AMERICA**

**The MLA**

29.    In response to reports of abuse by lenders, in 2006, the government passed the MLA, 10 U.S.C. §987.  Among other protections, the MLA prevented lenders from charging members of the military and certain of their dependents an annual interest rate of more than 36%. Notably, the 36% APR includes fees such as finance charges, application fees, and other charges

and fees.  The MLA prevents any lender from requiring a person covered by the MLA to submit to arbitration.  The MLA also mandates lenders disclose certain information to covered persons.

30.     Violations of the MLA are substantial.  A lender who violates the MLA can have their contract voided and is subject to civil liability, including damages and costs.

31.     The initial regulations issued in connection with the MLA allowed for a safe harbor for lenders when the borrower certified he was not covered by the MLA.

32.     Unfortunately, in response to the MLA, lenders modified their practices to avoid being covered by the law, while still being able to charge military members and their spouses usury rates.  The U.S. Department of Defense engaged in rulemaking starting in 2013 to improve and close loopholes lenders used to avoid the MLA.

33.     On July 25, 2015, the Department of Defense issued its final version of the new rules regarding the MLA.  The Department adopted an expanded definition of "consumer credit." Under this new definition, pawn loans were included under consumer credit, making pawnbrokers subject to MLA compliance.  In addition, the new rule removed the self-certification safe harbor. Instead, lenders had to conduct covered-borrower checks through the Department's online MLA database.  The new rule gave pawnbrokers until October 3, 2016 to become compliant with the new MLA regulations.

**The CFPB Takes Action Against Cash America**

34.     In January 2012, the CFPB began overseeing payday lending.  One such entity was Cash America International, Inc. ("Cash America"), one of the largest short-term, small-dollar lenders in the country at the time.

35.     Between 2008 and 2012, Cash America violated the MLA by, most notably, making loans to covered persons that exceeded the statutory maximum of 36% APR.  On November 20,

2013, the CFPB entered into a Consent Order between itself and Cash America (the "2013 Consent Order").

36.    As part of the 2013 Consent Order, Cash America admitted to violating the MLA. The 2013 Consent Order also stated that the employees of Cash America's subsidiary, Enova International, Inc., were "insufficiently trained with respect to MLA compliance" and "as a result have allowed additional loans to be originated to spouses of active-duty military members."

37.    Pursuant to the 2013 Consent Order, Cash America agreed to refund $8 million to consumers.  In addition, Cash America agreed to pay a $5 million fine.

38.    Cash America also agreed to cease and desist from any further MLA violations and develop and implement a comprehensive plan to improve its compliance with the MLA and other consumer financial protection laws.  The 2013 Consent Order required the CFPB to approve the compliance plan and for the plan to include "ongoing education and training in Federal consumer financial laws and the MLA for all appropriate employees, Board members, and other affiliated individuals, with training tailored to each individual's responsibilities and duties," and that "[t]raining activities shall be documented and the training program must be reviewed and updated at least annually to ensure that appropriate personnel are provided with the most relevant and pertinent information."

**The 2013 Consent Order Is Binding on the Company**

39.    Importantly, the 2013 Consent Order was binding on both Cash America and its successor in interest.  Cash America was also required to disclose a copy of the 2013 Consent Order to "any business entity resulting from any change in structure as set forth in Paragraph 59, any future Board members and executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives that will have supervisory responsibilities related to

the subject matter of the Order before they assume their responsibilities," if the transaction would incur within three years of November 20, 2013.

40.      FirstCash closed the merger with Cash America in September 2016, within the three-year time period.  Accordingly, as Cash America's successor in interest, the Company was subject to the 2013 Consent Order.  Accordingly, it is appropriate to infer that defendants Wessel, Orr, Feehan, Faulkner, Berce, Graves, Owen, and Montaño, as executives and directors of FirstCash at the time of the merger with Cash America, all received a copy of the 2013 Consent Order as required.



_____

[1] All references to "FIRST CASH _____" are from the Section 220 Documents produced in response to plaintiff's inspection demand.

████████████████████████████████████████████████████

██████████████████████

42. ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

43. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

44. ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ █████████████ █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

**FIRSTCASH DECEIVES THE PUBLIC WHILE VIOLATING
THE MLA AND THE 2013 CONSENT ORDER**

45.    Beginning October 2016, FirstCash was required to comply with the MLA and the 2013 Consent Order.  The Company claimed that in order to comply with the MLA it would simply not offer any of its products to members of the U.S. military or their dependents.  This was not true.  Indeed, despite defendants' public statements to the contrary, FirstCash lacked the internal controls necessary to prevent individuals covered by the MLA from accessing the Company's products.  As a result, for years FirstCash regularly violated the MLA and the 2013 Consent Order.  Further, the Company overstated its financial results, particularly for its U.S. segment, as a result of providing loans to covered individuals.  The truth about FirstCash's violations of the MLA remained hidden until the CFPB brought an action against the Company.

46.    ████████████████████████████████████████

███████████████████████████████████████  ███

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████  ███████████████████

██████████████████████  ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

47. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████     █████████████████

████████████████████████████████████████████████████

████████████████████████████

48.     On February 1, 2018, the Company issued the fourth quarter press release. FirstCash "announced record revenue, net income and earnings per share for the fourth quarter and full year ended December 31, 2017." The press release quoted defendant Wessel, who stated, "Our full year and fourth quarter results were outstanding, as FirstCash posted a record $1.8 billion in consolidated revenues for the year and record single quarter revenues of $480 million. … We exceeded our fourth quarter and full year earnings forecast even without the fourth quarter benefit of the Tax Act." The Company reported over $277 million in outstanding pawn loans and, in the U.S. Operations Segment, Pawn loan fees of over $93 million for the quarter and over $380 million for the year.

49.     Concerning the Cash America Merger, the press release quoted defendant Wessel, stating:

> As we continue to integrate the Cash America operations, we have significantly surpassed the initial synergy estimates and realized approximately $62 million in administrative cost savings in 2017, primarily through the consolidation of corporate support functions including duplicative IT, financial and human resource systems. We expect in-place run rate synergies of at least $70 million as we begin 2018, which is well in excess of the original target of $65 million.

> In addition to the significant cost synergies achieved in 2017, the Company accomplished other important Merger integration milestones. As *of year end, all Cash America stores have been converted to the proprietary FirstPawn point of sale and loan management platform*.

- 18 -

50.    On February 13, 2018, the Company filed with the SEC a Current Report on Form 8-K attaching as an exhibit its most recent Investor Presentation.  Concerning the regulatory environment, the Company stated it only had "limited exposure to CFPB rules for payday lending" and included the following slide:

## STABLE REGULATORY CLIMATE FOR PAWN

- PAWN LOANS ARE DIFFERENT FROM TRADITIONAL CONSUMER LOAN PRODUCTS AND NOT SUBJECT TO THE CFPB SMALL DOLLAR LOAN RULES BECAUSE THEY:
    - ARE NON-RECOURSE LOANS
    - HAVE SIGNIFICANTLY SMALLER AVERAGE LOAN SIZES
    - DO NOT INVOLVE CREDIT CHECKS, COLLECTION ACTIVITIES, ACH TRANSACTIONS OR NEGATIVE CREDIT REPORTING
- REGULATIONS ARE PRIMARILY AT THE STATE LEVEL IN THE U.S. AND THE FEDERAL LEVEL IN LATIN AMERICA
    - NO SIGNIFICANT NEGATIVE REGULATORY CHANGES IN THE LAST 25 YEARS
    - STATES WITH A POSITIVE RATE CHANGE INCLUDE:
        - OHIO (119 STORES): ENACTED MARCH 28, 2017
        - WASHINGTON (33 STORES): ENACTED JULY 24, 2015
        - ARIZONA (35 STORES): ENACTED JULY 24, 2014
        - NEVADA (27 STORES): ENACTED OCTOBER 1, 2011

Note: As of 12-31-17



26

51.    The Company filed additional presentations containing substantially similar information, including: (i) that there was a "[s]table regulatory climate"; (ii) that "[p]awn loans are different from traditional consumer loan products and not subject to the CFPB Small Dollar Loan rules because they … do not involve credit checks, collection activities, ACH transactions or negative credit reporting"; (iii) that "[r]egulations [for pawn loans] are primarily at the state level in the U.S."; and (iv) that there had been "[n]o significant negative regulatory changes in the last

25 years" on May 2, 2018, July 31, 2018, September 11, 2018, October 29, 2018, November 6, 2018, February 11, 2019, May 6, 2019, July 30, 2019, November 12, 2019, February 11, 2020, May 6, 2020, June 23, 2020, August 3, 2020, November 5, 2020, and February 24, 2021.  On May 4, 2021, August 3, 2021, and September 7, 2021, the Company filed a similar presentations with the SEC that omitted the phase "limited regulatory exposure" and claimed that there has been "[m]inimal regulatory changes over the last 25 years" instead of "[n]o significant regulatory changes over the last 25 years."

52.    On February 20, 2018, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants Wessel, Orr, Feehan, Berce, Faulkner, Graves, Montaño, and Owen signed the 2017 Form 10-K.  The 2017 Form 10-K stated: "The Company maintains a well-trained internal audit staff that conducts regular store visits to test compliance of financial and operational controls. Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term."

53.    Concerning the MLA, the 2017 Form 10-K stated:

In July 2015, the U.S. Department of Defense published a finalized set of additional requirements and restrictions under the Military Lending Act ("MLA Rule"). The MLA Rule (and rules previously adopted thereunder) have prevented the Company from offering its pawn services and its short-term unsecured credit products to members of the military or their dependents because none of the Company's products carry a military annual percentage rate of 36% or less. The MLA Rule, which went into effect on October 3, 2016, amended requirements for its "safe harbor" (making covered member attestation insufficient on its own to comply with the "safe harbor" provision of the MLA Rule) and expanded the scope of the credit products covered by the MLA to include certain non-purchase money loans secured by personal property, including pawn loans, or vehicles and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%.

54.    The 2017 Form 10-K bragged that the Company has a:

proprietary computer information system that provides fully-integrated functionality to support point-of-sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory management, customer recordkeeping, loan management, compliance and control systems and employee compensation. Each store is connected on a real-time basis to a secure data center that houses the centralized databases and operating systems. The information systems provide management with the ability to continuously monitor store transactions and operating results.

55.    The 2017 Form 10-K also reiterated the financial results from the earlier press release, including that the Company generated more than $380 million in pawn loan fees in fiscal year 2017 from the United States.

56.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████ ██
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████ ██ ██████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████

57.    ███████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████ ██ ████████████████████████████████████
███████████████████████████████████████████████████████

- 21 -



58.     On April 26, 2018, FirstCash issued the press release announcing its financial results for the first quarter of the 2018 fiscal year.  The press release stated that pawn loan fees revenue from the Company's U.S. Operations Segment reached over $96.2 million.  The press release quoted defendant Wessel stating, "We believe the combination of an improving U.S. operating environment, continued merger integration progress and the strength of our free cash flows will drive both near and long-term earnings growth."  Defendant Wessel continued:

> In the U.S., the operating environment for pawn lending continues to improve. …
> These are important post merger milestones that we now expect to achieve sooner
> than initially anticipated. The particularly strong sequential improvements in loan
> balances and retail margins in the Cash America stores are the direct result of our
> efforts to quickly and efficiently integrate all of the stores onto the FirstPawn IT
> platform during 2017.

59.     The Company reiterated these financial results in its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018, filed with the SEC on April 30, 2018.

60.     As stated above, the Company filed an Investor Presentation with the SEC on May 2, 2018.  In addition to the statements identified above, the presentation also claimed that FirstCash had "limited exposure to CFPB rules for payday lending" and that "[t]raditional pawn loans are excluded from the new CFPB rules."

61.     ██████████████████████████████████████████████████████



62.    ████████████████████████████████████████

63.    On July 26, 2018, the Company issued the press release announcing its financial

results for the second quarter of the 2018 fiscal year.  FirstCash reported, for its U.S. Operations

Segment, $87.8 million in revenue from pawn loan fees and that it had $268 million pawn loans

outstanding, amounts it subsequently repeated in the Company's Quarterly Report on Form 10-Q

for the second quarter ended June 30, 2018, filed with the SEC on August 1, 2018.  The press

release quoted defendant Wessel, stating:

> In the U.S., we are seeing strong sequential retail margin expansion, improving
> inventory turn ratios and an increased segment profitability, all of which are the

direct result of our efforts to integrate all of the U.S. stores on a common set of operating best practices, underpinned by the integration of our technology platform and compensation plans that help drive store profitability metrics.

64.     The Company's Investor Presentation filed with the SEC on July 31, 2018, claimed that "[r]etail margins improved… [d]riven by legacy Cash America utilization of the FirstPawn IT platform[.]"  FirstCash made the same statement in its Investor Presentation filed on September 11, 2018 and similar statements in its presentations filed on October 29, 2018, February 11, 2019, May 6, 2019, and June 11, 2019.





68.    On October 25, 2018, the Company issued the press release announcing its financial results for the third quarter of the 2018 fiscal year. The Company claimed revenue from the U.S. Operations Segment included $93.3 million in pawn loan fees. In addition, the Company had approximately $279 million in U.S. pawn loans. These financials were reiterated in FirstCash's Quarterly Report on Form 10-Q for the third quarter ended September 30, 2018, filed with the SEC on October 31, 2018.

69.

70.



71.    On January 31, 2019, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year-end of 2018. The press release stated that the Company's U.S. Operations Segment revenue for the quarter and full year from pawn loan fees was approximately $95 million and $373 million, respectively. The release further stated that, as of December 31, 2018, the Company's U.S. pawn loans outstanding totaled $272 million.

72.    The press release quoted defendant Wessel touting the Company's "higher quality pawn loan portfolio." In particular, defendant Wessel stated:

> Turning to the Company's U.S. operations, we again reported solid growth in segment profitability, driven primarily by the 3% growth in pawn fees and continued retail margin expansion. Although fourth quarter retail sales were down 2% versus last year, both inventory turns and retail margins improved which drove an 8% increase in retail gross profit. Likewise, pawn fees grew 3% on a lower pawn receivable balance, a result of increased yields on a higher quality pawn loan portfolio. Much of these improvements are in the legacy Cash America stores, which are now realizing the benefits of the FirstPawn IT platform and the implementation of the integrated compensation plans put in place in early 2018 to drive greater store efficiencies.

73.    On February 5, 2019, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K") with the SEC. Defendants Wessel, Orr, Feehan, Berce, Faulkner, Graves, Montaño, and Owen signed the 2018 Form 10-K. The 2018

Form 10-K stated, "The operation of pawn stores is governed primarily by state laws…." It also stated, "The Company maintains a well-trained internal audit staff that conducts regular store audits to test compliance of financial and operational controls." "New employees are introduced to the business through an orientation and training program that includes on-the-job training in lending practices, layaways, merchandise valuation and general administration of store operations." In particular, the 2018 Form 10-K stated:

> The Company has employee-training programs that promote customer service, productivity and professionalism. The Company utilizes a proprietary computer information system that provides fully-integrated functionality to support point-of-sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory management, customer recordkeeping, loan management, compliance and control systems and employee compensation. Each store is connected on a real-time basis to a secure data center that houses the centralized databases and operating systems. The information systems provide management with the ability to continuously monitor store transactions and operating results.

74.     Regarding the MLA, the 2018 Form 10-K stated, in particular:

> In July 2015, the U.S. Department of Defense published a finalized set of additional requirements and restrictions under the Military Lending Act ("MLA Rule"). The MLA Rule, which went into effect on October 3, 2016, amended requirements for its "safe harbor" (making covered member attestation insufficient on its own to comply with the "safe harbor" provision of the MLA Rule) and expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%. While the Company does not believe that active members of the U.S. military or their dependents comprise a significant percentage of the historical customer base in most locations, compliance with the MLA Rule, including its safe harbor provisions, is complex, increases compliance risks and related costs and limits the potential customer base of the Company.

75.     FirstCash also reported more than $373 million in U.S. pawn loan fees in 2018.

76.     ██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████    ████████████    ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

77.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████  ██████████████████████████████

████████████████████████████████████  ██████████████

██████  ██  ████  ████  ██████  ████  ██  ████  ██  ████

████████████████████████████████████████████████████

██████████████

78.     On April 24, 2019, the Company issued a press release announcing its financial results for the first quarter of the 2019 fiscal year.  The Company announced U.S. Operations Segment revenue from pawn loans fees of $97.8 million and that it had $234 million in U.S. pawn loans outstanding.  FirstCash reiterated these results in its Quarterly Report on Form 10-Q for the third quarter ended March 31, 2019, filed with the SEC on May 3, 2019.

79.     ████████████████████████████████████████████

████████████████████████████████████████████████████



80.

81.    On July 24, 2019, the Company issued a press release announcing its financial results for the second quarter of the 2019 fiscal year.  FirstCash reported U.S. Operations Segment revenue of $90.1 million from pawn loan fees.  It also stated that the Company had $262 million in U.S. pawn loans outstanding.  The Company reiterated these results in its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019, filed with the SEC on July 29, 2019.

82. 

84.     On October 23, 2019, FirstCash issued a press announcing its financial results for the third quarter of the 2019 fiscal year.  The Company announced revenue of $95.1 million from pawn loan fees in the U.S. Operations Segment.  In addition, FirstCash stated that it had $271 million in U.S. pawn loans outstanding.  The Company reiterated these results in its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2019, filed with the SEC on October 28, 2019.

85. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

86. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████  ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████  ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████  ██████████████████████████████
████████████████████████████████████████████

87. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████  ██████████████████████

██████████████████████████

88.    On January 29, 2020, FirstCash issued a press release announcing its financial results for the fourth quarter and fiscal year-end of 2019.  The Company reported U.S. Operations Segment revenue of $96 million from pawn loan fees and that it had nearly $270 million in U.S. pawn loans outstanding.

89.    FirstCash filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 Form 10-K") with the SEC on February 3, 2020.  Defendants Wessel, Orr, Feehan, Berce, Faulkner, Graves, and Owen signed the 2019 Form 10-K.  Concerning compliance and controls, the 2019 Form 10-K stated:

> The Company has employee-training programs that promote customer service, productivity and professionalism. The Company utilizes a proprietary computer information system that provides fully-integrated functionality to support point-of-sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory management, customer recordkeeping, loan management, compliance and control systems and employee compensation. Each store is connected on a real-time basis to a secure data center that houses the centralized databases and operating systems. The information system provides management with the ability to continuously monitor store transactions and operating results.
>
> The Company maintains a well-trained internal audit staff that conducts regular store audits to test compliance of regulatory, financial and operational controls. Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term.
>
> *        *        *
>
> New employees are introduced to the business through an orientation and training program that includes on-the-job training in lending practices, layaways, merchandise valuation, regulatory compliance and general administration of store operations. Certain experienced employees receive training and an introduction to the fundamentals of management to acquire the skills necessary to advance into management positions within the organization. Management training typically involves exposure to revenue and margin generation, regulatory compliance,

recruitment and human resources management, asset and security control and cost efficiency.

\* \* \*

The Company maintains robust consumer compliance, anti-money laundering and anti-bribery training programs[.]

90.     Regarding the MLA, the 2019 Form 10-K stated, in particular:

In July 2015, the U.S. Department of Defense published a finalized set of additional requirements and restrictions under the Military Lending Act ("MLA Rule"). The MLA Rule, which went into effect on October 3, 2016, amended requirements for its "safe harbor" (making covered member attestation insufficient on its own to comply with the "safe harbor" provision of the MLA Rule) and expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%. While the Company does not believe that active members of the U.S. military or their dependents comprise a significant percentage of the historical customer base in most locations, compliance with the MLA Rule, including its safe harbor provisions, is complex, increases compliance risks and related costs and limits the potential customer base of the Company.

91.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████   ████████████  █████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

92.     ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



93.     On April 22, 2020, FirstCash issued a press release announcing its financial results for the first quarter of the 2020 fiscal year.  The Company reported U.S. Operations Segment pawn loan fee revenue of $97.8 million and that it had $224 million of U.S. pawn loans outstanding. FirstCash reiterated these results in its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2020, filed with the SEC on April 27, 2020.

94.



95.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████  ██  ██████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████

96.    On January 28, 2021, FirstCash issued a press release announcing its financial results for the fourth quarter and fiscal year end of 2020.  The Company reported U.S. Operations Segment pawn loan fee revenue of $74 million for the quarter and $310 million for the year. FirstCash also reported that the Company had $220 million U.S. pawn loans outstanding.

97.    FirstCash filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 Form 10-K") with the SEC on February 1, 2021, which reiterated the financial results in the press release.  Defendants Wessel, Orr, Feehan, Berce, Faulkner, Graves, and Owen signed the 2020 Form 10-K.

98.    Regarding compliance on training, the 2020 Form 10-K stated:

The Company has employee-training programs that promote customer service, productivity and professionalism. The Company utilizes a proprietary computer information system that provides fully-integrated functionality to support point-of-sale retail operations, real-time merchandise valuations, loan-to-value calculations, inventory management, customer relationship management, loan management, cash management, compliance and control systems and employee compensation. Each store is connected on a real-time basis to a secure data center that houses the centralized databases and operating systems. The information system provides management with the ability to continuously monitor store transactions, assets, loans and operating results.

The Company maintains a well-trained audit and loss prevention staff which conducts regular store visits to verify assets, loans and collateral and test compliance with regulatory, financial and operational controls. Management believes the current operating and financial controls and systems are adequate for the Company's existing store base and can accommodate reasonably foreseeable growth in the near term.

\*       \*       \*

New employees are introduced to the business through an orientation and training program that includes on-the-job training in lending practices, layaways, merchandise valuation, regulatory compliance and general administration of store operations. Certain experienced employees receive training and an introduction to the fundamentals of management to acquire the skills necessary to advance into management positions within the organization. Management training typically involves exposure to overall financial acumen, including revenue and margin generation, cost efficiency, regulatory compliance, recruitment, human resources management and asset and security control.

99.    Regarding the MLA, the 2020 Form 10-K stated, in particular:

In July 2015, the U.S. Department of Defense published a finalized set of additional requirements and restrictions under the Military Lending Act ("MLA Rule"). The MLA Rule, which went into effect on October 3, 2016, amended requirements for its "safe harbor" (making covered member attestation insufficient on its own to comply with the "safe harbor" provision of the MLA Rule) and expanded the scope of the credit products covered by the MLA to include overdraft lines of credit, pawn loans, or vehicle and certain unsecured installment loan products to the extent any such products have a military annual percentage rate greater than 36%. While the Company does not believe that active members of the U.S. military or their dependents comprise a significant percentage of the historical pawn customer base in most locations, compliance with the MLA Rule, including its safe harbor provisions, is complex, increases compliance risks and related costs and limits the potential customer base of the Company.

100.    On February 24, 2021, the Company filed with the SEC a Current Report on Form 8-K that attached as an exhibit the Company's Investor Presentation for February 2021. In addition to the Investor Presentation statements mentioned above, the February 2021 presentation stated that employees undergo "[s]pecialized skill training programs in lending practices, merchandise valuation *and regulatory compliance*." The Company also stated that FirstCash had "[r]obust consumer and corporate compliance programs." The Company filed similar Investor Presentations containing the same language with the SEC on May 4, 2021 and on August 3, 2021.

101.    ███████████████████████████████████████████

███████████████████████████████████████████████████



102.

103.　　On April 21, 2021, the Company issued a press release announcing its financial results for the first quarter of the 2021 fiscal year.  FirstCash reported revenue from pawn loan fees of $76.3 million from its U.S. Operations Segment.  The Company reported approximately $170 million in outstanding U.S. pawn loans.  FirstCash repeated these results in its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2021, filed with the SEC on April 26, 2021.

104.





108.    On July 21, 2021, the Company issued a press release announced its financial results for the second quarter of the 2021 fiscal year.  FirstCash reported U.S. Operations Segment revenue of $66.9 million from pawn loan fees.  The Company reported $203 million in outstanding U.S. pawn loans.  FirstCash reiterated these amounts in its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2021, filed with the SEC on July 23, 2021.





111.

112.    On October 20, 2021, the Company issued a press release announcing its financial results for the third quarter of the 2021 fiscal year.  FirstCash reported $76.6 million in pawn loan fees from its U.S. Operations Segment and nearly $243 million in outstanding U.S. pawn loans. On October 25, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2021, which reiterated these financial metrics.

### THE TRUTH EMERGES

113.    The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge when on November 12, 2021, the CFPB announced that it filed a complaint against FirstCash for violations of the MLA and the 2013 Consent Order.  According to the CFPB, the lawsuit was the result of an investigation that lasted at least six months, during

which the CFPB served at least two CIDs on the Company, one on May 26, 2021 and the second on September 30, 2021.  The CFPB stated that starting in June 2017, at the latest, and continuing until at least May 2021, FirstCash and Cash America "made over 3,600 pawn loans to more than 1,000 covered borrowers from stores in Arizona, Nevada, Utah, and Washington."  The CFPB Director Rohit Chopra stated that "FirstCash is a repeat offender and cheated military families over and over again" and that "FirstCash and Cash America West gouged military families and robbed them of their rights to go to court."

114.    The CFPB was constrained in the time period and geography due to the limited data it had from FirstCash.  It stated that it only reviewed locations representing 10% of FirstCash's pawn stores.  However, the CFPB stated that it believes that the Company made similar illegal loans in other states and during an extended time period, which will likely come out as the litigation continues.  Indeed, an analyst at Janney Montgomery Scott LLC wrote, "the CFPB appears to be laying the groundwork for a larger investigation, as the loan applications they reviewed only cover a portion of [FirstCash's] footprint," while lowering his fair value estimate of the Company to $78 per share.

115.    On this news, FirstCash's market capitalization plunged more than 8.7%, or $7.50 per share, to close at $78.64 per share on November 12, 2021, compared to the previous trading day's closing of $86.14 per share, erasing over $300 million in market capitalization in a single day.

116.    The Company's stock price continued to fall as the market internalized the news on the CFPB to just over $70 per share on November 16, 2021.  In just three days, FirstCash's market capitalization dropped over $636 million, or over 18%.

117.    On November 12, 2021, *MoneyWatch* published an article on the CFPB lawsuit against FirstCash.  There, the author revealed that the CFPB stated in court that it warned Cash America in 2013 about overcharging on interest rates, but the Company kept doing it even after the merger.

## REASONS THE STATEMENTS WERE IMPROPER

118.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    the Company made loans to active-duty members of the military and their dependents that violated the MLA and the 2013 Consent Order;

(b)    FirstCash failed to adequately train staff not to make loans to active-duty members of the military and their dependents that violated the MLA and the 2013 Consent Order;

(c)    the Company's compliance controls failed to prevent loans to active-duty members of the military and their dependents that violated the MLA and the 2013 Consent Order;

(d)    FirstCash's financial results were inflated by loans to active-duty members of the military and their dependents that violated the MLA and the 2013 Consent Order;

(e)    the Company's statements regarding regulations and regulatory changes were misleading because they failed to discuss the obligations under the 2013 Consent Order and the oversight by the CFPB, a federal agency;

(f)    the Company received CIDs from the CFPB, which defendants failed to disclose, concerning violations of the MLA and 2013 Consent Order; and

(g)    as a result of the foregoing, defendants' representations were false and misleading.

## DAMAGES TO FIRSTCASH

119.    As a result of the Individual Defendants' improprieties, FirstCash disseminated improper, public statements concerning its compliance with the MLA, its internal controls, the regulatory structure and environment in which it operated, and its financial metrics.  These improper statements have devastated FirstCash's credibility as reflected by the Company's over $636 million, or 18%, market capitalization loss.

120.    FirstCash's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, FirstCash's current and potential customers consider a company's ability to comply with federal law and agreements with regulatory agencies.  FirstCash's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

121.    Further, as a direct and proximate result of the Individual Defendants' actions, FirstCash has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the CFPB action;

(b)    costs incurred from defending and paying any settlement in the class action for violations of federal securities laws; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to FirstCash.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff brings this action derivatively in the right and for the benefit of FirstCash to redress injuries suffered, and to be suffered, by FirstCash as a direct result of breaches of fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants.  FirstCash is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff will adequately and fairly represent the interests of FirstCash in enforcing and prosecuting its rights.

124.    Plaintiff was a stockholder of FirstCash at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current FirstCash stockholder.

125.    The current Board of FirstCash consists of the following nine individuals: defendants Wessel, Feehan, Faulkner, Berce, Graves, and Owen and nondefendants Paula K. Garrett, Marthea Davis, and Douglas R. Ripple.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Wessel, Feehan, Faulkner, Berce, Graves, and Owen Face a Substantial Likelihood of Liability for Their Misconduct**

126.    As alleged above, defendants Wessel, Feehan, Faulkner, Berce, Graves, and Owen breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings.  ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

127.    Defendants Wessel, Faulkner, and Owen were all on the Board at the time of the Cash America merger.  Defendants Feehan, Berce, and Graves were members of the board of directors of Cash America at the time of the 2013 Consent Order.  Thus, defendants Wessel, Feehan, Faulkner, Berce, Graves, and Owen all received the 2013 Consent Order pursuant to the terms of the order.  Nevertheless, defendants Wessel, Feehan, Faulkner, Berce, Graves, and Owen allowed the Company to operate without internal controls to ensure MLA compliance and are responsible for the Company's violations of the MLA in breach of their duty of loyalty to FirstCash.

128.    Defendants Berce, Faulkner, Graves, and Owen, as members of the Audit Committee, discussed and reviewed the "presentation of information … included in earnings press releases as well as the financial information … provided to analysts and rating agencies."  They also discussed with the Company's General Counsel significant "legal, compliance or regulatory matters that may have a material effect on … the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies."  Defendants Berce, Faulkner, Graves, and Owen, as provided by the Audit Committee Charter, discussed with management the Company's policies regarding risk assessment and risk management, as well as the steps management has taken to monitor and control such exposures. Thus, the Audit Committee Defendants knew about the MLA control deficiencies and the CFPB investigation into the Company's MLA and 2013 Consent Order compliance.  Yet, the Audit Committee allowed the Company to continue to operate without proper MLA controls and approved materially misleading public statements. Accordingly, the Audit Committee Defendants

breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

129.    Defendants Faulkner, Graves, Berce, and Owen, as members of the Nominating and Corporate Governance Committee, were responsible for:

> Oversee[ing] the system of corporate governance of the Corporation, including: (i) developing and recommending to the Board a set of corporate governance structures and procedures for the Company; (ii) reviewing and reassessing the adequacy of the structures and procedures at least annually; and (iii) recommending improvements to such governance structures and procedures for adoption by the Board and incorporation into the Company's written guidelines, as the Committee believes are appropriate.

Despite these obligations, defendants Faulkner, Graves, Berce, and Owen failed to institute appropriate controls to stop the violations of the MLA and 2013 Consent Order, despite being on notice of these violations.

130.    In addition, defendant Feehan will not vote to initiate litigation against defendant Wessel or the rest of the Board because he is an employee of the Company.  Pursuant to an agreement between defendant Feehan and the Company, he is a "nonexecutive employee" that receives a base salary of $300,000 and is entitled to participate in all savings, retirement, and welfare benefit plans available to other employees.  Defendant Feehan's agreement expires next year and, thus, any action opposed to defendant Wessel or the Board places renewal of his agreement in doubt.

## COUNT

### Against the Individual Defendants for Breach of Fiduciary Duty

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 46 -

132.    The Individual Defendants owed and owe FirstCash fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe FirstCash the highest obligation of care and loyalty.

133.    The Individual Defendants and each of them, violated and breached their fiduciary duties.

134.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, FirstCash has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

135.    Plaintiff, on behalf of FirstCash, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of FirstCash, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties;

B.    Directing FirstCash to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FirstCash and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over MLA compliance, including improved employee training;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the

Board;

       3.      a provision to permit the stockholders of FirstCash to nominate at least three candidates for election to the Board; and

       4.      a proposal to strengthen FirstCash's oversight of its disclosure procedures;

     C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of FirstCash has an effective remedy;

     D.      Awarding to FirstCash restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

     E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     F.      Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

     Plaintiff hereby demands a trial by jury.

Dated: July 18, 2022

                         BALON B. BRADLEY LAW FIRM

                         /s/*Balon B. Bradley*
                         Balon B. Bradley, Attorney-in-Charge
                         State Bar No.: 02821700
                         11910 Greenville Avenue, Suite 220
                         Dallas, TX 75243
                         Telephone: (972) 991-1582
                         Facsimile: (972) 755-0424
                         E-mail: balon@bbradleylaw.com

                         ROBBINS LLP
                         *(pro hac vice applications forthcoming)*
                         Brian J. Robbins
                         Kevin A. Seely
                         Mario D. Valdovinos

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
       kseely@robbinsllp.com
       mvaldovinos@robbinsllp.com

*Attorneys for Plaintiff*

1576646